Good morning. Good morning, your honors. May it please the court. The issue in this case... You're ready to argue already? That's quick. I'm sorry. You don't want to waste any time. Why don't you go ahead. I'm sorry, your honor. For the record, we need to, uh... for the tape at least, it's... this is... The first case to be orally argued is 2008-1245, Heartland By-Products v. the U.S. And you can start your argument any time you're ready. Thank you, your honor. May it please the court. The issue in this case is whether the trial court's determination of the scope of Heartland 1 failed to give effect to this court's reversal in Heartland 2 by finding that Heartland 2 did not govern any of the entries at issue here, but instead gave a guarantee to the importer that shielded it from any risk. The trial court effectively placed the entries outside the normal operation of liquidation statutes, thus preventing customs from applying this court's finding in Heartland 2. The trial court had a rational explanation for that. She said that in order to, in essence, vindicate the whole process under subsection H, the pre-importation review process, appellate review process, it was necessary to shield all entries that had been made based on a ruling in favor of the importer under subsection H. That's her theory. I mean, it's easy to see what's wrong with that theory. Yes, your honor, you are correct that the trial court used the jurisdictional statute. What's wrong with the theory of the Court of International Trade? There's nothing within the statute itself or the legislative history or operation of the normal appellate process and the liquidation statutes that show that the remedy that can be given in a 1581H action should be so widespread. Right, well, there's no legislative history that supports the decision of the Court of International Trade, nor is there any legislative history that's adverse to it, right? Yes, your honor, what the legislative history says, if I may clarify, is that the extraordinary nature of 1581H jurisdiction stems from the fact that it's extraordinary because the importer does not have to go through the process that would normally entitle it to jurisdiction under 1581H. It's a perfect example for this particular case. Here's somebody who's in Canada or someplace, wants to come to the United States to start a business. They need to bring some things in from Canada. There's two possible ways these things can be dutied, and there's a 5,000% difference between the two. So the person doesn't want to start a business, bring in a whole lot of the molasses or whatever, and learn that they're on the wrong side of the classification, so they go to New York and they ask for a ruling. Here they got a ruling that was favorable, and it took a while for it to be revoked. That created a problem. But in the ordinary courts, what the whole statute contemplates, that if the importer got an unfavorable ruling in New York, they'd go to the Court of National Trade, and if they got a favorable ruling, then they're blessed, right? That's the theory of the Court of National Trade. 1581H provides review of the ruling, yes, it's true. And in this case, the original New York ruling was an error, which is why we're here now, because it was a revocation ruling. And 1581H in this case provided review of that ruling. But it's for that ruling pre-importation, and if an importer can show irreparable harm, yes, that's true. But it does not speak to the scope of the remedy, however. I took the Court of National Trade to be seeing this really as a policy case, and they were construing this statute from a policy point of view. The consequences of a ruling in your favor, in essence, is the destruction of a business in the United States, correct? Businesses, they're cooked, they're finished. But that wasn't without Heartland also taking some action on its own. The way Judge Barsley looked at this statute was to say, well, here Congress created a safe haven, a place where someone who wanted to start a business, create jobs, create taxable income in the United States, do all those things that's good for the United States. Congress created an avenue where someone could come and get that relief and that assurance. That is what the trial court said, Your Honor, yes, that's true. And that's the way that she construed 1581H. However, that's not what the statute says. The statute is very specific that it provides review of a ruling only. But what the trial court did was that it took its ruling, which was then reversed subsequently in Heartland 2, so it's a non-final appealable order. It's like Heartland decided to enter at its own risk under the authority of Heartland 1. On a different tack, I take your position to be that the major failure here was that the ruling of this court in Heartland 2 should be given full faith and credit in application in the ordinary course. It should be given application certainly to the non-final entries. My understanding is that our decision in Heartland 2 was made in August. I think it was August 30th of 2000. Yes, that's correct. And the mandate didn't issue until down in December. Yes, that's correct. There were 1225 entries made after the decision and before the mandate that were liquidated. Isn't that correct? I do not know if that is correct. The numbers in your adversary brief, is that a false number? In our record, if you look at A69 in the appendix, it's like our representation. Because plaintiff did not provide any specific entry numbers, there was no way for us to completely confirm. And in fact, our numbers are slightly off. In fact, we say there's five. But you started liquidating even before Heartland 2 was mandated. I'm not entirely sure if that's correct. We extended. We extended liquidations. We extended those entries that would come due for liquidation. What was the basis for extending? Because of the unstable state of the law. Is that a legitimate ground for extension? Under 1504B, yes. Do you have a case that says that? Not specifically to that. Doesn't 1504 say you extend if you don't have all the information necessary to liquidate? Part of the information, Your Honor, would be Heartland 2. Heartland 2 was not a final opinion at that point. It was not a final decision. The mandate had not issued. The mandate issued on December 11, 2001. Yes, that's correct. I believe that you're speaking to your letter of March 3. If we're talking about liquidations, if customs had liquidated or reliquidated prior to the issuance of the mandate on December 11, then those liquidations or reliquidations should be done in Heartland's favor. Why is that? Because Heartland 2 was not effective. All we have is declaratory relief. There wasn't any injunction. No. Well, so the Supreme Court has said that the declaratory relief is not coercive. Yes, but, Your Honor, customs, we do follow whatever the law is, whatever the pronouncement is. Well, that may be true as a matter of policy, but if there's a liquidation before the mandate issues and there's no injunction in place, that's not unlawful to liquidate under those circumstances, is it? Well, Your Honor, the way that we see it is that Heartland 2 would not apply until the issuance of the mandate, that Heartland 1 would continue to apply. So any of the liquidations were made prior to the mandate being issued and would go in Heartland's favor? Yes. But you don't know whether there were any. I don't. I don't believe that there is, only because- How can you not know that? But if there were, then we would have to affirm on that basis. You would have to- prior to the mandate being issued would be acceptable in Heartland's favor? Up until the time of the mandate issuing. What if they could have been liquidated afterwards? If they could have been liquidated after December 11th? In other words, if the time hadn't run and they could have been liquidated the day after the mandate, but they were mistakenly liquidated before the mandate. If any of customs actions that occurred after the issuance of the mandate- No, no, you're not understanding what I'm saying. Suppose there was a liquidation before the mandate issue. At the higher rate. At the higher rate. And this is not a situation in which the time would have run on the liquidation. They could have been liquidated instead. Reliquidated. Reliquidated on the date after the mandate issued. Does the fact that they were inadvertently or improperly liquidated before the mandate issued means that Heartland wins as to those entries? If it was an inadvertent liquidation and customs could still, pursuant to statute, reliquidate after the mandate- Yeah. Yes. Then I believe that it can be reliquidated at the higher TRQ duty rate. Customs actions after December 11th. But why is your theory that it's harmless error? The hypothetical is that you have an entry that is after the decision before the mandate in H2. And it got liquidated at the higher rate. Liquidated or reliquidated. And you said a minute ago, that's wrong. They should have been liquidated at the lower rate. If there were any liquidations or reliquidations, yes, that's right. Now, the problem is you have an entry that was actually liquidated before the mandate at the higher rate. Okay? But on the day it was liquidated, if you tag 90 days onto it- Correct. Yes. You get past the mandate. Right. And Judge Dyke's question was, well, was reliquidating at the higher rate in essence harmless error because you could have, although you didn't, 90 days later, reliquidated at the lower rate? Would it be harmless error? Have I not been clear? I mean, the situation is such that you have said that if you liquidated before the mandate at the higher rate, then you said that's a mistake and something ought to be done to give that money back to the importer. Now, our hypothetical is a situation in which you did liquidate at the higher rate. Okay? Right. Which was a mistake and was wrong. But the question is, was it a harmless error? Because you could have, although you didn't, you could have reliquidated 90 days after the liquidation and been on the safe side of the mandate and done it at the lower rate. Your Honor, are you assuming that customs then would not reliquidate after the date of the mandate if there were, in fact, a liquidation that occurred prior to the mandate? Well, you didn't, in fact, do any liquidations or you didn't do any redos with respect to liquidations that occurred before the mandate after the mandate, right? I don't believe so. But you did liquidate before the mandate. No, I don't believe so, Your Honor. Well, there's a pretty wild difference of opinion between you and your adversary on whether or not there were any liquidations taking place in what I'll call the no man's land, right? Right. And I'm shocked that somebody doesn't know exactly the answer because Judge Barzilay put her finger right on this in Heartland 3. Well, Your Honor. And she said there are different classes of importations here and different times when liquidations were made. Well, Your Honor, at the time, if I may say, it's like at the time that Judge Barzilay issued Heartland 3, we didn't know the actual state of the entries at that time. We didn't. And, in fact, in our record below here, it's like if you see our statement. What is the customs doing? Twiddling its thumbs? I mean, they started doing something on October 5th. That's in the record. Reliquidations, Your Honor. That's in the record. And that's after our decision. I don't know, maybe they were extending or they were liquidating. I don't know what they were doing, right? And apparently you don't know what they were doing. And nobody wrote down what they were doing, I gather. Well, I don't know precisely. However, it's like if that's – certainly we could work on that. One of the reasons why we didn't know exactly what was going on at the time is because when Heartland put in these numbers, there were no entry numbers for us to track. So things – Well, assuming for purposes of argument, just so I get off this topic and let you go someplace else, assuming the panel – and I don't know what we'll have on the panel – were to decide that you've essentially got it right on the main piece of the appeal, namely that Heartland 2 has bite, but that the Heartland 2 doesn't bite until after the mandate, right? Yes. So wouldn't the proper thing to be to remand the case to the Corporation of National Trade any liquidation that took place in what I would call no-man's land at the higher rate was illegal, and consequently you and your adversary at the Carbon Dioxide Trade Office sort out which entries they're entitled to a refund on? Yes, in terms of re-liquidations or liquidations, yes. I would say that that would be correct. Well, all of these entries are in the history book now, aren't they? I mean, they've all gone so far beyond 365 days, and how many you can only extend for 90 days, right? Correct. So all these entries are carved in stone down by the New York Harbor somewhere? There is a record. To dig the history up on those babies? Yes, indeed there is a record. However, as I was trying to explain, the reason why we couldn't absolutely confirm is because we didn't have entry numbers to be able to match everything up. I assume you don't have the slightest clue about how much, supposedly $65 million was involved in this period time between Heartland I and Heartland II. You don't have any clue to how much of it may be involved in liquidations before the mandate? No, I do not, Your Honor, but I can certainly get the information. If so, if I may just say also that the interpretation by the CIT of its judgment, it also goes against any of the other liquidation statutes that operate, which cause the ability of customs to act on those open and non-final entries after the date of the mandate. I mean, we have what we could almost now call vast literature on this case, several opinions, and Judge Bartley has made very, very clear throughout that she recognizes and understands what happens in a normal case, and what happens in a normal case is exactly what you're arguing, and she's simply saying that subsection H puts the normal process on hold. That is what she's saying, Your Honor, but what I'm saying is that 1581H does not authorize any such extraordinary remedy such as that to take it out of the normal operation, the normal appeal process, the normal operation of statute that governed liquidation. The legislative history doesn't say that, the plain face of the statute doesn't say that, and other legal constructions such as a repeal by... Is it possible to interpret a statute sort of if you're in a sense trying to do equity through the eyes of the facts of the case? I mean, this case has two screwball aspects to it that Congress didn't have in mind when they put H in place. One was that ruling that you got pre-importation in your favor, so you didn't need to use subsection H, right? And the whole idea that you would be able to start your business, that got interrupted a couple of years after they got their business going when some competitors ran in and said, you know, change the ruling. Secondly, there was a two-year hiatus between Heartland I and Heartland II that creates a problem, right? Yes, Rod, those things certainly did happen. However, we need to remember... And so the ultimate effect of Heartland II was to shut the business down, and Heartland has to live with that, right? Correct. But couldn't you possibly construe these statutes, sort of a tweak on the Court of International Trades theory, and say in the setting of this case, these entries that are coming in in this two-year no man's land period when that large gap of time was in no way the fault of either the U.S. government or Heartland? No, Your Honor, if I may disagree, 1581H allows review of a ruling. It's not final until it goes through the appeal process. Heartland could have asked for expedited appeal and then acted. Because it made entries in reliance on a non-final judgment in Heartland I, it must live with the consequences of that. And because it was reversed by this Court. I see I'm into my rebuttal time. No, well, once you finish your sentence, we'll restore two minutes of your rebuttal time. Have you finished? Well, no, that process is no different in any other jurisdiction under 1581. There's nothing that insulates the appellate process. You need to have a final order if you want a guarantee. Well, the final order also applies to customs. So the final order was not until a mandate on Heartland II. And we agree with that, Your Honor. We do. And we agree with that. Why don't we hear from the other side? We'll restore two minutes of your time. We'll add two minutes to your time if you need it. Thank you, Your Honors. May I please accord Stan McDermott on behalf of Diapoli Heartland? Just to clarify that point, as to the pre-mandate entries, there really is no dispute. Exhibit I to Heartland's complaint identified all of the We got that in the record here? Exactly, yes. In our little... Yes, Joint Appendix 29. And if you add the numbers up, which is what Judge Barzilay did, you find that there were 1,225 entries made in that period following the decision prior to the mandate. And then after the mandate issued, a further 3,874 entries were liquidated for a total of 5,099. And Judge Barzilay made findings of fact in her decision adopting these numbers. Do we know what happened to the 1,225? Yes, they were... Let me just tell you for purposes of argument, I mean, the worst case scenario for you is the notion, is what the Corp of National Trade did. That's the worst case scenario for you. A possible slightly better case scenario for you is what we were talking about earlier, which is to say the entries in what I'll call no man's land after the decision before the mandate, the ones that were actually liquidated at the Heartland, the higher rate, the government says wrong. So how do we know whether of these entries, which ones got liquidated? Do we need a remit? No, I don't believe so. They were all liquidated. And 24%... There's a difference of opinion between... Ms. Lee's been on this case except for her short maternity leave from the get-go. And I would think people would know these numbers. Well, I agree. I think our numbers are exactly correct. How do we know from page 29 when these liquidations occurred? If you... It's the left-hand column here? Yes, exactly right. And whose document is this? This was Heartland's Exhibit 1 to the original complaint. But how do we know that the government agrees with that? Well, we don't except for the fact that in the government's reply brief at page 7, footnote 2, they acknowledge, based upon their records, not in the record, that 5,312 entries were liquidated, whereas we, Heartland, say 5,099. Which page? That's the reply brief, page 7, footnote 2. I mean, the government has gone back. And I really don't want to spend all my time on this. Yeah, but, I mean, if you look at your little chart, I mean, the entries that were liquidated after December 11th, okay, you've got December 14th, 21, those entries were liquidated after the mandate. Exactly, if you draw a line underneath December 7th. So the ones the government was talking about you might get back would be the ones above that line. Exactly, 1,225. No, there's not 1,225. And the ones below that line, excuse me, are the ones that were liquidated after the mandate. Well, what's wrong with the government liquidating before the mandate issue? We only had declaratory relief here. The Supreme Court, in a variety of cases, including Kennedy versus Mendoza-Martinez, has specifically said that when only declaratory relief has been granted, the government is free to go ahead and do whatever it is that's the subject of the declaratory relief. You never had any coercive relief here. No, but the answer, Your Honor, is that the revocation ruling was never in effect. No, no, you're not answering my question. My question is why was it unlawful for the government to liquidate, assuming that it did, before the mandate issue? We have a situation which involves declaratory and not injunctive relief. Of course you've got to obey an injunction until the mandate issues, but what case says you have to obey a declaratory order until it becomes final? Because the effect of this declaratory order was to nullify the revocation ruling, which imposed... What case says that? I've given you a case which says that the government remains free, in a declaratory judgment situation, to disobey the declaratory judgment until it becomes final. What case says that they have to abide by a declaratory order until the mandate issues? Well, I don't have a case for you, Your Honor, but I would say that in this case on these facts, when the effect of the declaratory order is to invalidate the classification that would support the higher duty, then the existing classification during that period, following the decision until the mandate, is the non-TRQ classification, and that is the only classification to which the duty could be fixed. And because that order, the revocation ruling, did not take effect, we say, until the mandate issue on December 11th. That seems to be your main argument, rather than an argument that the liquidations before the issuance of the mandate should be treated differently. Yes, and I think the two are tied together. I think the two are tied together. If I may give you the historical... Did you raise this issue about the liquidations before the mandate as a separate issue? Yes, yes. That was presented to Judge Barzilai in the court below. That's why she addressed... Do you know at what stage? Well, it was raised initially in Heartland 3, and then, of course, attention refocused on it in the decision below, which is why in the complaint we spelled out the difference between the pre and post. No, I thought your theory was that the ruling had to be applied to entries that occurred... Oh, that is our case. Okay, but we're talking about a different question, which is not... Let's assume, hypothetically, we reject your argument about the entries, and we say that under Harper, the decision of this court has to be retroactive. Did you separately argue that there was something wrong with liquidating the entries before the mandate issue? Yes, our argument was that those liquidations were nullities because the mandate had not issued, and there was no power to liquidate until the mandate did issue, and that's why we say 24% of the entries... Do you suppose you could identify for us, maybe with a letter, where and what brief or in what motion you made that argument? Because I got the briefs that I could get from the Corps of National Trade looking to see if that argument had been made, and I couldn't find it. I'm happy to do so, Your Honor. It certainly doesn't show up in Heartland 3, or it doesn't show up in any of the CIT's Heartland opinions, a clear focus on this class and the legal consequences. She does recognize this class in Heartland 3. I'm happy to direct the court's attention to that. But why couldn't the items which had been liquidated prior to the mandate be reliquidated after the mandate? Possibly they could have been, but they weren't. And when the 365 days run, ran, excuse me, they were deemed liquidated, and that was the end of it. Well, according to page 29, there was some liquidation after the mandate, substantial liquidation. You're exactly right. The 76% of the total at stake in this case were liquidated after the mandate. Those were not reliquidations of the ones prior to the mandate? No. There are no double entries, according to your records? Correct. As to the post-mandate liquidations, do you have any argument, other than your reliance on the supposed purpose of subsection H, as to why it was improper to liquidate those at a higher rate? Yes, I do have. There's an issue that was raised in the summary judgment papers that I would like to revisit here, because I think it's relevant, and I think it ties into the historical perspective of what happened here. This argument you will find in the summary judgment papers, but I'll restate it here, and I'm happy to redirect the court's attention to it. But as Judge Clevenger mentioned, this case started out with a ruling in Heartland's favor. It was then attacked by the two trade associations that brought a petition under Section 1516 seeking to have customs essentially vacate the existing ruling in Heartland's favor. And it's important to consider just what that 1516 petition would have accomplished. But was the New York ruling final at that point in time? It couldn't have been final if it could be challenged. It's final, but it's always subject to a 1516 petition by an interested party seeking to have it changed. The significance is that in 1516, the effective date of any court decision, whether the CIT or the decision of this court, takes effect only after the decision has been published. In other words, if a 1516 challenge is granted throughout the appeal process, then entries are affected only after the decision has been published. In other words... The revocation decision. The decision of this court. If you read 1516, it's tied into the regulatory history. What does 1516 say? Is it quoted in your brief? It's not addressed specifically in... You didn't raise this issue in the brief. Not in this court, but it's raised in all of the summary judgment papers which were presented to Judge Barzilaw. Is it the language of 1516 you're relying on? 1516-F is the... What exactly does it say? It says that any decision... Do you have the quote? Yes. In the nature of these statutes, the wording is what it is, but the jurisprudence is quite clear that the effect of the decision... No, no, I want the language. Yes. 1516-F. If a cause of action is sustained in whole and in part by a decision of the United States Court of International Trade or of the United States Court of Appeals for the Federal Circuit, merchandise of the character covered by the published decision of the Secretary, which is entered for consumption or withdrawn from warehouse for consumption after the date of publication in the Federal Register by the Secretary of the court decision shall be subject to appraisement classification in accordance with the final judicial decision in the action. In other words, you can't reclassify until there's been publication of the decision, meaning that the decision can have only prospective effect, not retroactive effect. And that's... Why didn't you argue that in your brief here? Well, the brief here responded to the opinion below. This was an issue that was raised, not addressed by Judge Barzilay. You're trying to raise it at oral argument. You must think it's significant. Why don't you put it in the brief?  What you're trying to say is that that section totally overrides all notions of when it is that ruling of our court becomes binding on the parties. You're saying that if Customs chose, for example, to wait for a year before it's put in the Federal Register, our decision, you would enjoy the lower rate during that entire year. Exactly right. It imposes deferred... If they had decided for three years. That's exactly right. And that statute, 1516F, is incorporated into the regulations at 19 CFR 152.16 subpart D. And it also specifically recites, as a policy matter, that there is only prospective effect to any change in classification accomplished by a 1516 action. If there's such a simple and easy solution to your problem, which you presented to Judge Barzilay, why does she resist your warm embrace and instead jump backwards through 25 hoops trying to find a way to make 15... make subsection H override normal practice? Well, I don't... I don't get it. Well, I don't think she resists what we were saying at all. I think she felt it unnecessary to reach it because she was convinced, I think correctly, that H is, in fact, a special statute, that it does substantially materially depart from all preexisting practice embedded, if you will, in subpart A, 1581A, and that we believe she is entirely correct to conclude that you can't possibly give retroactive effect to a judgment that originates with a 1581H proceeding. The point of my reference to 1516F is to show that the policy has always been to give prospective effect to decisions that change classifications. Well, we're not dealing with policy. We're talking about legal obligation here. And if I may, it's a very good question, Your Honor, and if I may address it this way. What happened was Customs, in the light of that petition, then said we're going to treat this under 1965C, and that is what led to the revocation ruling that was issued in September that would have taken effect on November 8, 1999, that would then have imposed the classification at the higher TRQ rate. Now, under that revocation ruling, up until December 8, 1999, Heartland could have continued to enter the goods. They would have been entered at the non-TRQ rate, and Customs would have been required to liquidate those entries as made under the non-TRQ rate. There was no ability on Customs' part to separate the entries from the liquidations, which is what this case is all about. We say an artificial separation of the entries and the liquidations. So there was a 60-day notice period. It's the notice period required by 1965C. Heartland then went into court. It said to the Court of International Trade, we do not ask you to permit that revocation ruling from taking effect, and that is what the effect of Heartland 1 is. It declared the revocation ruling unlawful. The revocation ruling never took effect in 1999 as it otherwise would have taken effect. It wasn't enjoined, was it? No, but that was a declaration. It was a declaratory judgment. As I understand what the Supreme Court has told us, it isn't binding until it's final. Well, there is legislative history behind 1581H in which Congress speaks to the fact that the Court of International Trade under H was accorded only declaratory power,  but you simply cannot conclude that there was no right on Heartland's part to continue to import, because what otherwise would the 1581 judgment have accomplished? Well, they couldn't continue to import. They're just at risk that they may lose the case. That happens all the time to people. Well, it does, yes, but if the whole purpose of 1581H is to get the safe haven, is to preserve the business, is to not be at risk for the ruinous TRQ duties that would have killed the business instantly, as it did do only two years later, then you can't say that the government can perpetuate that risk of irreparable harm. But doesn't your view of the effect of H have the incentive to the importer to delay the case as long as possible? It can't. No, it can't. It has 60 days. If the importer has won before the Court of International Trade, just delay as long as possible with the appeal. You don't expedite the appeal. You don't try to get a prompt ruling, because you're going to get the benefit of that decision as long as it isn't reversed. Well, I think that's correct, but I think it's the government's obligation to try to stay the effect of that judgment. If the government believes that the court is wrong, it's the obligation of the government, the appellant, to seek to stay, to try to expedite the appeal. Stay of what? There's no coercive relief. You get stays of injunctions. You don't get stays of declaratory judgments, do you? But what's the effect of a 1581 judgment if the importer cannot rely upon it? Well, you can rely on it as much as an ordinary person can rely on a declaratory judgment, really. Let's say that you want to build a $100 million building someplace, and the question is, what's the exact line on the property line? And you think you have a little bit more property than somebody else thought you had, so you go get a declaratory judgment ruling, right? And the declaratory judgment's ruling in your favor, and you say, whoopee, I can put my building over the line. You're not going to go start building your building if your adversary takes an appeal from that declaratory judgment ruling. Are you? Not build a building, no, but in this context. You're not going to start a business, right? Yes, you would start it. If you say, for example, you want to go get a declaratory ruling that the following 88 people qualify for a green card, and they're going to be your employees, and you get a nice district court judge who says, yes, sir, I'll give you a declaratory judgment, these people are going to qualify for a green card, you're out of your mind if you start your business the next day having those people as your employees. When the government has said to you, we're going to appeal that ruling. But that's what happened. I mean, here, Harlan had a business. I pointed that out earlier. That's one of the facts that sort of maybe can strum a little bit of the equity in your heart here, because you got a business started, and you had two whole, was it two years, something like that, before the competition showed up to make the problem? Yeah, roughly speaking. Right. But the case can't be decided on that basis. We have to look at this as though we're just an ordinary case, like somebody goes in, you ask for a ruling, you get a ruling that's unfavorable, you go to the Court of National Trade, they ruin your favor, the government says, no, no, we're going to appeal. Aren't you kind of foolish if you act on the basis of the CIT decision when the appeal is presented? Yes, but in that case, Your Honor, then Harlan the importer will have experienced the exact irreparable harm that the statute 1581H was enacted to prevent. Because if with that favorable judgment in hand, Hartman could not... It's because of the way the situation happened here. I mean, the notion that the government says in its brief, well, you just wait until, don't start your business until all appeals have run. Your problem was you were already two years into your business. Yes, but the irreparable harm was the immediate shutdown of the business, together with the financial consequences of the extraordinarily high duty. But if the declaratory judgment had no effect, then Harlan would have been required to stop, to not... What is there in H itself, or its legislative history, that suggests that a declaratory judgment by a trial court that is subject to review is immediately binding? Where does it say that? Well, it has to be immediately binding, we say, if the effect is to invalidate the ruling. But that's a matter of policy. Where does it say in H that a trial court decision is binding if it's reversed on appeal? It doesn't say that in H, clearly. H doesn't speak to this precisely. But Judge Barzilay concluded correctly that, quote, the entire rationale for pre-importation review under H is that customs will be bound to apply the court's decision on the adjudicated ruling to future entries. But which court decision? The final court decision? Well, this court's decision, Hartland 2, August 30, 2001, it reversed the decision of the Court of International Trade. Essentially, by reversing that ruling, it activated, for the first time, the revocation ruling that would have taken effect on November 8, 1999. And the point there is that this court's decision, August 30, 2001, on that date, the issues of the mandate aside, but on that date, whether that date or 60 days later with the mandate, only then, for the first time, did that revocation ruling, the ruling that imposed a higher classification duty, have effect. And you stopped importing immediately? Immediately. And our point is that when you enter up until that day, when the classification of the goods is at the non-TRQ rate, and you recognize and acknowledge that the very day that this court activates, for the first time, the revocation ruling imposing the higher TRQ duties, then yes, the risk is material, it's presented for the first time, because only then is there a revocation ruling that would impose the higher TRQ rates. And in that light, and for that reason, Hartland stopped importing immediately. Even though it wasn't published at that point? Does it have to be published and registered? This didn't go the distance as a 1516F proceeding. It was sidetracked, if you will, under 1695C. But the whole reason, or the whole... What's a 1516F proceeding? It's a petition by interested domestic parties to challenge the effect of an existing customs ruling. It's why the two trade associations here... Oh, so your argument is that we should look at this as though it were just a petition by interested parties to change the thing, and that 1516F makes a ruling on such a petition prospective only. Yes, we're saying that... I understand. Excuse me. This all started as a 1516 proceeding. Had it ended, there would be no question that this is prospective effect only. We say, that being the case, how can you conclude that in a special purpose 1581H proceeding, where the importer is given the extraordinary right to prevent irreparable harm, to go into court, to get the declaratory ruling, which invalidates the revocation ruling that would impose a higher duty, how can you say that that importer should be victimized in contrast to another importer, who in an ordinary 1516 proceeding would get the benefit of the prospective effect only? So what you're saying is that 1516F doesn't directly apply here, but that it suggests that we should interpret... Exactly right. And it's precisely the point that we raised in the summary judgment papers. And with the court's permission, I would ask for leave to write a short letter to the panel, just explaining just how this had been presented to the parties. And while it's still open to Hartland as the appellee to protect the judgment by all of the arguments that are supported, particularly those arguments already in the record having been presented to the court below. Well, why don't you do that within 10 days of today and make sure that you show it to the government so that they would have an opportunity to reply to it and file it simultaneously, both your letter and a reply to that letter. Is that acceptable to the government? Yes. Thank you. Five pages. Five pages or less. Maybe even shorter if you can do it. Well, I don't need to be long because the arguments have already been spelled out. I just wanted to be clear that it is precisely, as Judge Dyke points out, that we raise this by analogy to illuminate the policy that has to apply and to show that you can't disadvantage the importer benefiting by the extraordinary declaratory relief provided by 1581H and treat its rights to a far lesser extent than you could the conventional importer trying to fight off a 1516 petition but ultimately losing. Well, we're already up to Heartland 7. We might be up to Heartland 8 before too long. Thank you, Mr. McDonough. Thank you very much. We'll restore three minutes of your time so that you can reply. Thank you, Your Honor. Your Honor, the issue of 1516F never arose. That was a petition that was filed a long time ago, but the revocation ruling was issued under 19 U.S.C. 1625C. He's not claiming it's a 1516F case. I know, Your Honor. He's just saying it's by analogy. Yeah, I know. I know, Your Honor, that that's what he's arguing. But I'd just like to clarify that that's not what happened here. I guess if I were in your position, what I'd be saying is, yeah, 1516F is very interesting. And the fact that there isn't any similar provision dealing with this thing suggests that it's not respective only. Okay. Thank you very much, Your Honor. Exactly what I was trying to do. So that's a point well taken, Your Honor. Thank you. The other thing that I just wanted to, and I hate to revisit this, but we have gone through the report that we had run by Customs. To our knowledge, there are no liquidations prior to the mandate, just to clarify for the record. There are re-liquidations. And we know that because it's over a year, you know, that these things. Re-liquidations prior to the mandate? Correct. Or after the mandate? Prior to the mandate. Any liquidations that occurred, if the time had run for the liquidation, were liquidated at a lower rate. That's what we have. That's our record. I don't understand what you're saying. Customs' actions prior to the mandate, the re-liquidations. There were re-liquidations. If there were any re-liquidations, they occurred at the lower rate. Sorry, that there were re-liquidations that occurred. And if there were any liquidations, it occurred at the lower rate. Why were there re-liquidations taking place? Because our time had run. As you properly noted, we have 90 days from a liquidation to effect a re-liquidation. Right. You're telling me that before the mandate issued, there were some injuries that you actually re-liquidated. I'm saying I wonder how you liquidated them in the first place. We liquidated them when the time had run. At what rate? At the lower duty rate. So there was no liquidation or re-liquidation before the mandate issued at the higher rate. That's what you represent. The re-liquidation would have occurred at the higher rate. Before the mandate? Before the mandate. Correct. Yeah, if there's any entries that Cousins acted upon at the higher rate, it would have been a re-liquidation. Any liquidation would have occurred at the lower rate. The liquidation, let's see if I have this straight. The liquidation occurred at the lower rate.  Before the mandate. My understanding was that after the Heartland 1 decision was made, Customs said, okay, we'll go along with that, and so they began liquidating entries at the lower rate. Correct. Right? Correct. That's what I understood they done, and that's what your adversary told us they did too. And then somewhere along the line in what I've called the no-man's land before the mandate, somebody said, well, we've got a decision, you know, let's see if we can't get some more money in here. So they started, I guess, re-liquidating. Because that was the end of the time, as you correctly observed, the 90 days had passed. Now, there must have been some entries that came in after Heartland 1 and before the mandate that got liquidated in that period, after August. We know there were entries that came in after August. Yes. Right? Well, right, they stopped entering August 30th, the day of the decision of Heartland 2. But someone, if necessary, could devote a few fascinating hours with a pencil and piece of paper and figure out exactly what happened to each of these entries, right? Yes, we could do that. I don't know whether they had been liquidated or re-liquidated at the higher rate before the mandate. Right. Why don't you supply that information as part of your letter? Okay, we can do that. Was that supplied below to the court? Or is this additional evidence? It was not formally supplied, no, except for what's already in the record, where we have the number of entries of what we believe happened, which was extension and re-liquidation. And if any liquidations occurred before the mandate, they would have occurred at the lower rate. And any of the re-liquidations that occurred after the mandate, that would have occurred at the higher rate. This is what we supplied to the court. Is it still your position? There's been a lot of conversation about the entries that were either liquidated or re-liquidated before the mandate, but done at the higher rate. And when you were up in your primary argument, you conceded that that was error. Yes, we are prepared to concede that's error. And that's your position. So, I mean, if you presented us with a chart and it said, okay, here's an entry that was, say, originally liquidated at the lower rate, Heartland won, but before the mandate was re-liquidated at the higher rate, never touched again, you would say that's a give-back to them. If it was never touched again. What does that mean, if it was never touched? If it wasn't re-liquidated after the mandate. How many times can you re-liquidate? I think once. Once. Right? I believe so. So if an entry had been liquidated at the lower rate and then re-licked at the higher rate, game's over, they get the money back from that one. I'm just trying to get clear where there's a concession here. I'm not trying to force you into saying something you don't want to say, but when you were in the earlier part of your argument, you were saying, as I understood it, that the bite, if you will, of Heartland 2 only arises after the mandate issues. All the entries that were liquidated after the mandate, you win, but any ones that were liquidated or re-liquidated in no man's land at the higher rate were wrong. Yes, but if there were entries that were liquidated during no man's land but were revisited as a re-liquidation after the mandate at the higher rate, that we would have re-liquidated at the higher rate. So we don't concede those because that would be properly affected. They were still open, non-final entries, according to statute. Those are the ones that there were 90 days that got you passed. Correct. Right, so the liquidation would have to occur because it's a normal liquidation cycle. Those were entries that were liquidated at the lower rate that you then re-licked at the higher rate after the mandate. Yes, Your Honor. What I was talking about were entries that you re-liquidated at the higher rate before the mandate. Right. You're not arguing that you're entitled to go back and putatively 698 days afterwards re-liquidate. Correct. Yes, yes. I hope we're somewhat clear. Wouldn't it be better for the CIT to handle all of this evidence and come up with a conclusion on it rather than sending it to us as new evidence? Whatever you deem is more appropriate, Your Honor. I mean, you had previously asked me to clarify in the same letter. If that's what you'd like, then that's fine. If not, then that's fine too. So. Well, I think if you can agree with the other side of what the facts are, that would be useful. Otherwise, I guess we'll have to send it back. With regard to the entries, yes. Okay. We can try and do that. As I said before, the reason why we couldn't specifically tie everything together was because we didn't have entry numbers. Because if you look at page 29. Right, but I mean, we want to move on and write a decision. So if you can't agree in a week's time or something like that, how long is it going to take you to do that? I don't think we want to sit around for two months. The history of good faith cooperation in this case is great. I mean, the judge pushed you together and tried to get settled in to solve her jurisdictional problem, but I mean, it never worked. You know what I mean? Why don't we see if we can get it done in 10 days? Okay, Your Honor. And we should submit it to you as well, right? As part of the same letter. Okay, Your Honor. Thank you very much. I think we've had enough time on the matter. We'll take it under advisement. Thank you very much, Your Honor. Case is submitted. Thank you.